TIMOTHY COURCHAINE
United States Attorney
District of Arizona
SARAH J. PRECUP
Assistant U.S. Attorney
Arizona State Bar No. 034335
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
sarah.precup@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> vs. <br><br> Cody Christian Likens, <br><br> Defendant. | CR No. 25-CR-01354-AMM-MSA <br><br> GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 26) |

On August 13, 2025, defendant Christian Cody Likens filed a Motion to Suppress Evidence as a Violation of the Fourth Amendment to the United States Constitution, seeking to suppress both the traffic stop and the search of his vehicle in this case. (Doc. 26.) Because officers had reasonable suspicion to stop and arrest Likens for driving on a suspended license, and properly conducted an inventory search of the vehicle to prepare it for towing and storage, the court should deny Likens' motion.

**I. Facts and Procedural History**

On October 3, 2024, two 911 callers self-identified as neighbors of Cody Likens reported that they had just seen Likens driving on a suspended license, leaving from a specific address in Oro Valley. In response, the dispatcher put out on "attempt to locate" or "be on the lookout" alert sent out to all Oro Valley Police Department (OVPD) Officers reporting that Likens was operating a motor vehicle on a suspended license. The alert

indicated that Likens was driving a flatbed pickup truck and provided the address where he had been seen, in in a neighborhood off of Oracle Road in Oro Valley, Arizona.

Oro Valley Police Department Officer Kris Brandstrom soon located Likens near Oracle Road and Water Harvest Road, driving a flatbed pickup truck. As it happened, Officer Brandstrom ended up stopped next to Likens at a red light. Likens had his driver's side window rolled down, and so Officer Brandstrom was able to see that Likens was driving the vehicle and there were no other occupants. Officer Brandstrom recognized Likens, as he had met him before.

On information and belief, Officer Brandstrom will testify that he also conducted his own check that Likens' license was suspended. Having confirmed that Likens was driving the vehicle with a suspended license, Officer Brandstrom initiated a traffic stop. Likens yielded. As seen on body-worn camera footage, Officer Brandstrom approached and asked Likens for proof of insurance. While working on getting proof of his insurance, Likens volunteered that he would be getting his license reinstated that week.

As seen on body-worn camera footage, soon after, Brandstrom asked Likens to exit the vehicle, told him he was placing him under arrest for driving on a suspended license, and did so, handcuffing him. He informed Likens that he would "go see the judge," referring to the standard state procedure where arrestees are brought before a magistrate judge for an initial appearance. Noting that Likens was on the phone with his mother, he held up the phone so Likens could say goodbye and tell her that he was going to Oro Valley Police Department. Officer Brandstrom conducted a pat-down of Likens and then put Likens in the rear of a marked patrol vehicle.

The Vehicle Removal Report, (Exh. 1), shows an officer requested a tow for Likens' vehicle at 22:03. In the audio recording of the radio call log, around the same time, the

dispatcher can be heard confirming, "Catalina's [Towing] en route." In the meantime, officers conducted an inventory search of the vehicle.[1]

In the course of the search, officers located, in relevant part, a homemade suppressor and a Ruger .22 caliber rifle. The Ruger measured approximately 16 inches and had a barrel length of approximately 10.5 inches, making it a short-barrel rifle under Title 26 United States Code Sections 5861(d) and 5845(a). The homemade suppressor is also considered a firearm under the same sections. Under the law, it is a crime to receive or possess either without registration in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). Oro Valley Police Department officers contacted a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regarding Likens. A later review of the National Firearm Registration and Transfer Record by the ATF Special Agent revealed that Likens does not have any NFA weapons registered to him.

Likens waived his rights and made a statement. He said that he was holding the rifles for a friend, and had planned to "get rid" of them. Likens also admitted he had no NFA firearms registered to his name.

On March 5, 2025, Likens was charged by a federal grand jury with two counts of Possessing an Unregistered Firearm in violation of 26 U.S.C. §§ 5845(a), 5861(d), and 5871, and one count of Possessing a Firearm Without a Serial Number, in violation of 26 U.S.C. §§ 5845(a), 5861(i), and 5871.

**II. Memorandum of Points and Authorities**

    *A. Officer Brandstrom Had Reasonable Suspicion to Conduct a Traffic Stop.*

The Supreme Court has established that law enforcement officials may conduct a brief investigatory stop based on reasonable suspicion. *United States v. Arvizu*, 534 U.S.

---

[1] A canine unit sniffed but did not alert to Likens' vehicle. Likens argues that the canine therefore does not provide probable cause to search without a warrant. (Doc. 26 at Pages 5-6.) The United States has never contended such. The search of the vehicle was an inventory search. The canine was not deployed until after Likens' arrest and is irrelevant.

266, 273 (2002). Reasonable suspicion "is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). It is less than probable cause, and "falls considerably short of satisfying a preponderance of evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu,* 534 U.S. at 277. In addition, "when there has been communication among agents," as here, "probable cause can rest upon the investigating agents' 'collective knowledge." *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990) (citing *United States v. Bernard*, 623 F.2d 551 (9th Cir. 1980)); *see also United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105-06 (9th Cir. 2002).

All that was required for Officer Brandstrom to stop Likens on October 3, 2024, was reasonable suspicion—a finding supported by the 911 calls from neighbors reporting Likens was driving on a suspended license, the "be on the lookout" issued by dispatch for Likens to all working OVPD officers stating that his license was suspended, Officer Brandstrom's own confirmation that Likens' license was suspended, and Officer Brandstrom's personal observation of Likens driving the vehicle. Here, considering all the facts and circumstances, Officer Brandstrom concluded—correctly—that Likens was driving on a suspended license, and he had reasonable suspicion enough to justify a stop.

### B. OVPD Officers' Search of the Vehicle Was a Legal Inventory Search.
#### i. Inventory Searches Are a Well-Defined Exception to the Warrant Requirement of the Fourth Amendment.

The inventory search is a "well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "The policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause . . . ." *Id.* (citations omitted). *See also South Dakota v. Opperman*, 428 U.S. 364 (1976). The Supreme Court has made clear that police officers may, "as part of the routine procedure incident to incarcerating an arrested person, . . . search any container or article in his possession, in accordance with established inventory procedures." *Illinois*

*v. Lafayette*, 462 U.S. 640, 648 (1983). This includes vehicles. *South Dakota v. Opperman*, 428 U.S. 364 (1976).

The inventory search must be conducted pursuant to established police department policy. *See Arkansas v. Sullivan*, 532 U.S. 769 (2001) (after arresting the defendant and placing him in squad car, officers conducted inventory search of defendant's car pursuant to inventory policy). Police inventory procedures satisfy the Fourth Amendment if conducted according to standardized criteria and not in bad faith or for the sole purpose of investigation. *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (citing *Colorado v. Bertine*). "Standardized" instructions for inventory searches need not be written, but must limit the discretion of officers and apply consistently across cases. *Snitko v. United States*, 90 F.4th 1250, 1261 (9th Cir. 2024). Where the officer may have had dual motives for conducting an inventory search—such as investigating for evidence as well as producing an inventory—the search is valid if the officer's conduct would have been the same regardless. *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993.)

These inventory procedures "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Florida v. Wells*, 495 U.S. 1, 4 (1990) (citing *Bertine*, 479 U.S. at 372). The government bears the burden of proving that the inventory search exception applies. *United States v. Ruckes*, 586 F.3d 713, 719 (9th Cir. 2009).

    ii.    **Officers properly followed department policy, state law, and town code in impounding and searching the vehicle.**

In this case, state law, Oro Valley Town Code, and the Oro Valley Police Department Policy Manual provide established policy for when and how officers may conduct an inventory search.

Article 11-3-15, Section (A)(4) of the Oro Valley Town Code authorizes members of the police department "to remove a vehicle from a street or highway" when, in relevant part, "any person is arrested while in possession of a motor vehicle and taken into custody." (Exh. 2.)

The Oro Valley Police Department Manual, Section 504 lays out the Vehicle Towing and Release Policy. Section 504.2 lays out specific procedures for employees storing or impounding a vehicle, including complying with A.R.S. § 28-872(D)(1) by completing and providing to the tow truck driver a vehicle impound report with the vehicle identification number, a number that identifies the department and officer ordering the tow, the year, make, and model of the vehicle, the license plate number, the date and time that the vehicle was towed, and the information of the registered owner to permit the towing company to notify the registered owner. (Exh. 3 at Page 2.)

Section 504.5, meanwhile, describes the parameters of and public policy underpinning the inventory search:

> All property in a stored or impounded vehicle should be inventoried and listed on the vehicle removal form. This includes the trunk and any compartments or containers, even if they are closed and/or locked. Members conducting inventory searches should be as thorough and accurate as possible in preparing an itemized inventory. These inventory procedures are for the purpose of protecting an owner's property while the owner is in police custody, to provide for the safety of officers and the public, and to protect the Department against fraudulent claims of lost, stolen or damaged property.

(Exh. 3 at Page 3.)

Here, OVPD properly arrested Likens while he was in possession of a motor vehicle for the offense of driving on a suspended license, and he was taken into custody. Oro Valley Town Code 11-3 A.4 therefore authorized OVPD to remove his vehicle. OVPD properly called for a tow truck for the vehicle and conducted an inventory search of the vehicle. Specifically, as described in OVPD Policy Manual Section 504.5, officers inventoried and listed the property in the seized vehicle on the vehicle removal form, including the closed container in the bed of the truck where the firearms were found, in a manner both thorough and accurate:

> Inventory – Keys, portable fan, blue speaker, OC spray, black flashlight, two cups, misc papers, green shirt, ball cap, yellow/black flashlight, eggs, cereal,

five yellow sticks, cigarettes, black light, black knife, brown compact, black coin purse (empty), misc toys, misc items, black sunglasses, misc tools, two train cars (toy), harmonica, lighter, pocket knife, white torch lighter, tooth paste, beaded necklaces, U.S. passport, garage door opener, four blankets, black shirt, white shirt, white flashlight, stereo, two black tower speakers, black bass, green scarf, window cover, white cloth zip lock, black lights, outlet cord, misc ammo belt, misc tension cords, furniture, traffic cone, tire jack, two trash bags, misc tools, paint, gas can

(Exh. 1.).

Further, OVPD officers properly included all of the required information on the Vehicle Removal Report, per Section 504.2. (*Id.*) In addition, the officers notified Communications of the tow as required, and the vehicle was entered as "stored" in a law enforcement database.

Likens' primary challenge to the legality of this inventory search appears to hinge on the words "stored or impounded" in Section 504.5 of the OVPD Policy Manuel. (Doc. 26 at Page 8-9) ("there does not appear to be impound compliance".)[2] Likens apparently suggests that at the time he was arrested, the vehicle seized, and a tow truck en route, the vehicle was not "stored or impounded," and therefore did not fall under Section 504.5 instructing that "all property in a stored or impounded vehicle should be inventoried."

To be sure, "towed" and "impounded" may often be used interchangeably in common parlance. But Likens fails to expand on his implicit argument that a vehicle that is seized but "not towed" must also necessarily be "not impounded." Seemingly to the contrary, in *United States v. Penn*, the Ninth Circuit repeatedly referred to a seized vehicle as "impounded" when the vehicle had not yet been towed from the scene. 233 F.3d 1111,

---

[2] Likens avers that he has standing to contest the search as his mother was the registered owner of the vehicle and that he had her permission to drive the vehicle, as documented in his mother's attached sworn statement. (Doc. 26, Exh. 1). For the purposes of this motion, the government does not contest Likens' standing to challenge the vehicle search.

1115-17 (9th Cir. 2000) ("Officer McConnell correctly impounded the car that Penn was driving and called for a tow truck."). There, the Ninth Circuit used "impounded" as a synonym for "seized," not "towed."

This meaning is corroborated by *Black's Law Dictionary*, which defines the verb "impound" as (1) "To place (something, such as a car or other personal property) in the custody of the police or court, often with the understanding that it will be returned intact at the end of the proceeding," or (2) "To take and retain possession of (something, such as a forged document to be produced as evidence) in preparation for a criminal prosecution." *Black's Law Dictionary*, 12th ed. 2024, Bryan A. Garner, Editor in Chief. Likewise, though the *Oxford English Dictionary* does contemplate one definition of "to impound" being "to shut in, enclose, confine (a person or thing) as in a pound," it provides another definition as "to seize or secure by legal right; to take legal or formal possession of (a document or the like) to be held in custody of the law." *Oxford English Dictionary*, oed.com/dictionary/impound_v, last accessed Aug. 27, 2025. One may also note that in the OVPD Policy Manual, sections 504.2.2, 504.2.3, 504.2.4, 504.2.5, 504.3, and 504.4 all repeatedly discuss the towing of a vehicle without ever using the word "to impound," suggesting that "impounded" is not, in 504.4, simply a synonym for "towed."

Here, at the time of the inventory search, Likens' car was "within the custody of the police," "seize[d] or secure[d] by legal right"; officers had "take[n] legal or formal possession." In sum, Likens' car was impounded within the first definition from *Black*'s, within the second definition from *OED*, and within the meaning of "impounded" as used by the Ninth Circuit in *Penn*. The vehicle was properly seized, and the officers properly followed policy in conducting an inventory search.

A final note: In support of his argument, Likens avers that "an on-the-spot inventory will be valid only if departmental policy specifically permits inventories to be conducted at the point of seizure," citing *Colorado v. Bertine*, 479 U.S. 367 (1987). Likens overstates *Bertine*'s holding. The location of the inventory search was not at issue in *Bertine*, and

nowhere in *Bertine* does the Court opine that departmental policy must specify with particularity where an inventory search takes place.

        **iii.    To the extent that officers deviated from official department policy by searching the vehicle while the tow truck was en route rather than after it was towed, this was not a material error.**

To the extent that the court finds officers deviated from department policy by searching the seized vehicle while the tow truck was en route rather than after the vehicle was towed, any error is not so material as to invalidate the inventory search. Courts have held that comparable administrative errors did not invalidate the inventory search. *See, e.g.*, *United States v. Penn*, 233 F.3d 1111, 1115-17 (9th Cir. 2000) (inventory search lawful even though officer may have allowed passenger to remove personal property from the car before the search, "contrary" to police and city policy); *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011) (stolen firearm omitted from inventory list); *United States v. Lopez*, 547 F.3d 364, 371 (2d Cir. 2008) (officer failed to "itemize each object").

        **iv.    Officers evinced no bad faith or dual motives in executing the inventory search, and the search would have occurred regardless of the officers' motivations.**

As described above, OVPD officers properly conducted the inventory search of Likens' vehicle after he was arrested, in preparation for its towing and storage. Likens' evidence of bad faith appears to boil down to that officers conducted the search contrary to policy in searching the vehicle without "impounding" it, which the United States disputes. Even if officers had conducted the search with "dual motives," the same inventory search would have been conducted and the evidence discovered. To whatever extent Likens alleges the officers had an investigative or other motive, therefore, as in *Bowhay*, that motive would therefore not invalidate the inventory search. *United States v. Bowhay*, 992 F.2d 229 (9th Cir. 1993.)

        **v.    By following routine procedures, the police would inevitably have discovered the evidence.**

In the alternative, the court need not decide whether the search was lawful, as the evidence would inevitably have been discovered through a routine inventory search. The

inevitable discovery doctrine is an exception to the exclusionary rule. *Nix v. Williams*, 467 U.S. 431 (1984). For the exception to apply, the prosecution must show by a preponderance of the evidence that the item(s) seized would have been discovered inevitably by lawful means. *United States v. Andrade*, 784 F.2d 1432, 1433 (9th Cir. 1986). As the Ninth Circuit noted in *Ankeny*, "In this circuit, the 'inevitable discovery' doctrine . . . provides that if, 'by following routine procedures, the police would have inevitably uncovered the evidence,' then the evidence will not be suppressed despite a constitutional violation." *United States v. Ankeny*, 502 F.3d 829, 825 n.2 (9th Cir. 2007) (as amended) (citing *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). For example, in *Andrade*, the defendant contended that the cocaine found in his garment bag should be suppressed due to a one-hour delay between his arrest and the search. *Andrade*, 784 F.2d at 1433. The Ninth Circuit held the cocaine would have inevitably been discovered during the defendant's processing at a government holding facility, when his garment bag would have been subject to an inventory search.

Likens' argument seems to be that at the time that Likens was arrested, the vehicle seized, and a tow truck en route, the vehicle was not "stored or impounded," and therefore did not fall under Section 504.5 instructing that "all property in a stored or impounded vehicle should be inventoried." Under Likens' interpretation, presumably, officers would have instead properly conducted the inventory search after the vehicle was towed to a lot or garage for storage. The officers would have discovered the same evidence then. Like in *Andrade*, the inventory search would inevitably have occurred as a matter of routine procedure, the officers would have inevitably followed their inventory search policy to open all closed containers, and the same evidence would have inevitably been discovered. The evidence should therefore not be suppressed.

/ / /

### III. Conclusion

When local law enforcement conducted a traffic stop on Likens on October 3, 2024, that stop was supported with facts meeting the "not particularly high" standard of reasonable suspicion, including at least one 911 call that Likens was driving on a suspended license, confirmation that Likens' license was suspended, and Officer Brandstrom's observation that Likens was driving a vehicle that matched the 911 caller's description in the same general area. Officer Brandstrom properly placed Likens under arrest and OVPD prepared to tow the vehicle. OVPD officers conducted an inventory search of the vehicle in accordance with state and local law and department policy. Even if the court were to find otherwise, the same evidence would have inevitably been discovered during a proper inventory search.

Therefore, Likens' requested remedies of suppression and dismissal are both unjustified, and his motion should be denied.

Respectfully submitted this 27th day of August, 2025.

TIMOTHY C. COURCHAINE
United States Attorney
District of Arizona

*s/Sarah J. Precup*

SARAH J. PRECUP
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 27th day of August, 2025, to:
All CM/ECF participants.