CODY CHRISTIAN LIKENS
10065 N. Alderspring Dr.
Oro Valley, AZ 85737
520-425-7415
codylikens1@gmail.com
Defendant, Pro Se



# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
|     Plaintiff, ) | **No. CR25-1354-TUC-AMM (MSA)** |
| ) | |
| vs. ) | **SUPPLEMENTAL BRIEF IN RESPONSE** |
| ) | **TO "COLLECTIVE KNOWLEDGE" DOCTRINE** |
| Cody Christian Likens, ) | **AND SUPPORT OF MOTION TO SUPRESS** |
|     Defendant. ) | |

It is expected that excludable delay pursuant to U.S.§3161(h) will occur as a result of this motion or of an order based thereon.

Defendant, Cody Christian Likens, appearing pro se with stand-by counsel only, submits this Supplemental Brief as the operative and controlling filing on the pending Motion to Suppress. All prior filings submitted by former counsel are withdrawn to the extent they conflict with the factual record or legal arguments presented here. This filing corrects material factual misstatements in the Government's submissions and addresses the Government's reliance on the collective-knowledge doctrine. The later federal escalation of this dismissed state incident —including the false fugitive designation, the use of a sealed indictment, and the timing of Defendant's arrest—demonstrates that the federal case did not arise from any new evidence or independent federal review, but from OVPD's retaliatory narrative that had already failed in state court. The continuity between OVPD's conduct and the Government's charging posture *(Controlling Supreme Court and Ninth Circuit authority collected in Appendix A.)*

1

underscores why the record presented to this Court is incomplete and distorted. For avoidance of doubt, Defendant's criticism is directed at the Government's charging decisions, factual characterizations, and disclosure practices, not at this Court. Defendant contends that the Court has been presented with an incomplete and inaccurate record because of the Government's omissions and misstatements, and submits this filing to correct and complete that record.

---

**Statement of Facts**

**The Government's Proffer Rests on a Foundation of False Factual Predicates**

The Government's justification for the October 3, 2024 stop rests on a pair of premises that collapse when compared against the contemporaneous record.

First, the Government's repeated characterization of the two 911 callers as "self-identified neighbors"—a description echoed both by the prosecution and by Officer Brandstrom—is not a harmless embellishment. It is a deliberate attempt to assign unwarranted indicia of credibility to the callers, recasting what were in fact anonymous, police-directed informants as if they were concerned identified citizen witnesses. This reframing materially alters the legal analysis: it elevates the reliability of the tips where none exists, obscures that both callers expressly invoked anonymity pursuant to OVPD instruction, and falsely suggests independent, neutral civilian reporting when the contemporaneous records show the opposite. The 911 recordings, Master Call Table entries, and radio logs confirm that both callers were anonymous—one expressly stating she was calling anonymously because OVPD instructed residents at the

2

October 1 neighborhood meeting to do so "so we can catch him... they wanted to catch him," and the other reporting "a guy everyone is looking for." These callers were not independent citizen informants; they were police-directed civilian agents. This orchestrated and retaliatory targeting was neither isolated nor organic—it was the product of deliberate law-enforcement direction.

Second, the Government and Officer Brandstrom again speak in unison, seeking to convert a civilian dispatcher's unverified assumption into the linchpin of reasonable suspicion and to resuscitate that assumption through a misapplied collective-knowledge doctrine. This attempt stretches the doctrine far beyond its intended boundaries and disregards the doctrine's three mandatory prerequisites for invocation. Furthermore, the attempt to support this misapplication relies on an additional assertion stated as fact in the Government's supplemental filing but contradicted by the existing record. While the Government inserts a caveat that its narrative may differ from the transcript "should there be material differences," the problem is not the prosecutor's recounting—it is that the testimony itself is materially inconsistent with the objective evidence.

OVPD's own CAD and Master Call Table entries show that only a single ATL was ever generated, and that ATL existed solely because the dispatcher inserted the phrase "driving on a suspended license" without any contemporaneous MVD confirmation or caller observation, and without any officer observing a traffic offense. The first call generated no ATL; it was coded "Suspicious Activity" and closed "No Contact," after Officer Fletcher and Officer Dominguez positioned themselves at both exits of Defendant's private gated community, "waiting for him

to come out." The second call, again—anonymous, police-directed, and devoid of predictive or corroborated detail—cannot supply lawful reasonable suspicion. No verified or lawfully transmitted information existed before the stop, and the collective-knowledge doctrine cannot be stretched to manufacture reasonable suspicion out of inferences that were never communicated, never confirmed, and did not report unlawful conduct or imminent danger sufficient to supply reasonable suspicion.

---

**Issues Presented**

1. Whether the October 3 stop and detention were supported by the particularized and objective reasonable suspicion required by the Fourth Amendment.

2. Whether civilians who acted at OVPD direction in surveilling Defendant and reporting anonymously must be treated as government agents under the Fourth Amendment.

3. Whether the discretionary tow and resultant "inventory" search may constitutionally validate evidence obtained after a constitutionally defective and well over-extended stop.

4. Whether the collective-knowledge doctrine can be invoked where the only pre-stop information derives from anonymous, police-orchestrated calls and a dispatcher's unilateral inference, and where contemporaneous dispatch/radio records show no lawful transmission of verified information to the stopping officer.

5. Whether the Government's attempt to litigate the suppression motion while withholding or delaying material exculpatory evidence, mischaracterizing anonymous callers as "self-identified neighbors," —despite contemporaneous CAD, radio, and 911 records to the contrary—constitutes mere negligence, or rises to intentional or reckless misconduct in violation of Brady, Rule 5(f), and due process.

6. Whether the violation of Defendant's Sixth Amendment rights, through a false "fugitive" designation obscured by a government seal in violation of Federal Rule of Criminal Procedure 6(e)(4), has severely prejudiced the defense by denying the right to a speedy trial and limiting Defendant's ability to seek suppression due to unknown allegations concealed therein.

---

**Argument**

*I. Governing Legal Principles*

Terry requires that brief investigatory stops rest on specific, articulable facts demonstrating reasonable suspicion that criminal activity is afoot. See Appendix A, § IV (Terry v. Ohio).

Anonymous tips ordinarily carry low indicia of reliability; an anonymous caller must provide predictive or verifiable detail, or police corroboration, to supply reasonable suspicion under the totality-of-the-circumstances test described in Alabama v. White and applied in anonymous-tip cases. The Supreme Court's guidance in Navarette is fact-specific and does not license treating

every anonymous 911 report as reliable without regard to corroboration and provenance. See Appendix A, § I.

Where police solicit or direct private persons to gather or provide evidence, courts ask whether the private persons were acting as instruments or agents of the State; if so, the private reports are State action subject to Fourth Amendment constraints. Coolidge explains that the critical inquiry is whether the private conduct is at the government's behest and thus transforms the private actor into a government agent (or not). See Appendix A, § III.

The Ninth Circuit has cautioned that dispatch cannot bootstrap reasonable suspicion from unreliable or unverified information; when an officer's assertion of reasonable suspicion depends on a dispatcher's inference from a tip, courts scrutinize whether the dispatcher's adoption of the information supplied any independent indicia of reliability. See Appendix A, § I (United States v. Thomas). Here, the problem is even more pronounced: the information did not come from an anonymous private citizen at all, but from police-directed civilian actors acting at OVPD's behest. Because those callers were functioning as State agents, the Fourth Amendment requires that their observations be treated as government action—not as independent citizen reports—and thus the anonymous-tip line of cases provides the Government no refuge. See Appendix A, § III (Coolidge and related authorities).

A collective-knowledge theory can justify a stop only where at least one officer in the chain actually possessed lawful reasonable suspicion of a crime and where that knowledge was contemporaneously and reliably transmitted to the stopping officer. Courts therefore examine CAD entries, radio traffic, and dispatch logs to determine whether imputation is proper. See

6

Appendix A, § II (Ramirez; Washington v. Lambert). Because no officer possessed lawful reasonable suspicion at the time of the stop—and because the purported information was never contemporaneously or lawfully transmitted—imputation is foreclosed as a matter of law.

Inventory searches and community-caretaking impounds are likewise narrowly confined: an impound must be justified by a legitimate, non-pretextual caretaking rationale, and any inventory must follow standardized, neutral procedures. Otherwise, the inventory doctrine cannot launder the fruits of an unlawful seizure. See Appendix A, § V (Cervantes; Wells; Bertine; Opperman).

---

### *II. The Stop Lacked Lawful Reasonable Suspicion at Its Inception*

The only pre-stop predicate for the ATL relied upon in the Government's reconstruction was a dispatcher's insertion of "driving on suspended license" language—added without any contemporaneous MVD verification or officer observation. Where reporting contains no predictive detail, no corroboration, and no reliable assertion of unlawful conduct, reasonable suspicion is absent under Terry and the anonymous-tip precedents. See Appendix A, §§ I & IV.

The dispatcher's unilateral inference cannot be used to manufacture reasonable suspicion where the underlying source was police-orchestrated. The Ninth Circuit's approach in Thomas prohibits bootstrapping suspicion from an unverified, unreliable source. See Appendix A, § I.

---

### III. The Collective-Knowledge Doctrine Cannot Save the Stop

Collective-knowledge imputation requires (a) that an officer in the communication chain actually possessed lawful reasonable suspicion or probable cause, and (b) that the knowledge was transmitted contemporaneously and documented through dispatch or radio traffic. The CAD and radio chronology here shows neither. See Appendix A, § II.

As Washington v. Lambert teaches, contemporaneous CAD and radio logs control over narratives reconstructed after the fact. Because no officer had lawful reasonable suspicion at the time of the stop, and because no such information was lawfully transmitted, the collective-knowledge doctrine is inapplicable. See Appendix A, § II.

---

### IV. OVPD-Directed Civilian Reporting Constitutes State Action Under Coolidge

Coolidge articulates the critical state-action inquiry: when private individuals act at the direction, control, or request of police to obtain or deliver evidence, their conduct is attributable to the State and subject to the Fourth Amendment. OVPD's October 1 meeting—where neighbors were instructed to surveil Defendant and report anonymously to "catch him"—transformed those civilians into State actors. Their calls must be evaluated as police-generated information. See Appendix A, § III.

---

*V. The Tow and Inventory Search Were Pretextual and Cannot Cure an Initial Fourth Amendment Violation*

Brandstrom's supplemental report states that Defendant was "cited and released," and the contemporaneous CAD disposition likewise classifies the incident as cite-and-release, not a custodial arrest. The vehicle was parked near Defendant's residence, posed no hazard, and yet was towed and inventoried. A discretionary, pretextual impound used to facilitate an investigative inventory violates the Fourth Amendment. When the underlying stop is unlawful, the inventory doctrine cannot salvage the search. See Appendix A, § V (Cervantes; Caseres; Wells; Bertine).

---

*VI. Additional Impeachment: Timestamp Irregularities, Log Gaps, and Prolongation of the Stop*

The electronic records reveal further inconsistencies that independently undermine the Government's narrative and Officer Brandstrom's credibility. The radio logs, CAD timestamps, and Master Call Table contain multiple irregularities—including gaps of up to fifty-nine minutes during the critical period in which officers claim to have established or corroborated reasonable suspicion. Several officers appear on scene yet do not appear in corresponding radio traffic, while other transmissions occur without matching CAD entries. These omissions and discontinuities reflect either off-radio coordination or incomplete logging, both of which materially impair the Government's ability to reconstruct a lawful basis for its actions.

Moreover, the duration of the stop itself far exceeded the constitutional limits set by Terry and Rodriguez. Defendant was never promptly presented to a magistrate, despite later assertions implying such review. The stop was prolonged well beyond the time necessary to address the purported reason for the encounter, and the contemporaneous record identifies no independent justification for that extension. This unjustified prolongation, coupled with the absence of any recorded steps toward judicial presentment, demonstrates that officers were not operating within a bona fide investigatory framework but were instead conducting an exploratory detention unsupported by reasonable suspicion. Under Rodriguez, prolonging a stop beyond the time required to complete its mission is unlawful unless supported by new, independent reasonable suspicion—something starkly absent here. See Appendix A, § IV.

---

## VII. *Government Withholding, Mischaracterization, and Federal "Sanctuary" for State Misconduct*

The Government's approach to litigating this suppression motion reflects not merely factual inaccuracy, but a pattern of conduct that risks violating Brady v. Maryland, Fed. R. Crim. P. 5(f), and fundamental due-process guarantees. The prosecution repeatedly mischaracterized anonymous callers as "self-identified neighbors,", ignored contemporaneous CAD, radio, 911, and Master Call Table entries, and withheld, delayed, or minimized exculpatory evidence that directly undermines the asserted reasonable-suspicion basis for the stop. Other than BWC footage under a protective order, all other facts the Defendent has about this case is from private discovery through public records requests.

10

This record forces a more serious inquiry: whether these acts constitute mere negligence or rise to the level of intentional or reckless misconduct. The pattern is too consistent, too aligned with OVPD's retaliatory narrative, and too incompatible with the contemporaneous evidence to be dismissed as harmless oversight.

The prejudice is clear. Misrepresenting anonymous, police-directed civilian actors as "self-identified neighbors" artificially inflates the reliability of the tips, invites the Court to apply the wrong legal standard, and directly affects the reasonable-suspicion analysis. The Government's repetition of OVPD's narrative—despite internal contradictions in its own records—operates as a form of federal sanctuary for the misconduct of a separate sovereign. Federal prosecution cannot serve as a vehicle to launder state-level constitutional violations or adopt factually inaccurate assertions that collapse when measured against objective evidence.

This conduct compromises the integrity of the suppression proceedings and independently supports the need for expanded evidentiary review, sanctions, and suppression.

---

***VIII. Violation of the Sixth Amendment; Structural Prejudice From the False Fugitive Designation, Improper Sealing Under Rule 6(e)(4)***

Defendant's Sixth Amendment rights to confrontation, compulsory process, and a speedy trial were materially impaired when the Government secured a false "fugitive" designation and used that designation to obtain and maintain a sealed indictment under Fed. R. Crim. P. 6(e)(4). Rule 6(e)(4) permits sealing only when necessary to secure the defendant's arrest. Defendant had no

11

outstanding warrants, no history of absconding, no attempts at evasion, and no factual basis supporting any claim that he could not be located. The "fugitive" label was unfounded on its face. At the same time as being labeled a fugitive, excessive unwarranted surveillance culminated in the "high-risk" execution of a sealed federal arrest warrant by OVPD while taking his children to school, absent jursidiction or regard for the safety of minor children, OVPD policy, or proper documentation of the incident.

The false fugitive designation, the improper maintenance of a Rule 6(e)(4) seal, and the escalated arrest based on misinformation prevented Defendent from challenging omissions, falsehoods, and reckless disregard under *Franks v. Delaware* and exercising his Sixth Amendment rights to confrontation, compulsory process, and a speedy trial.

The prejudice has continued through the Government's maintenance of the seal. One cannot litigate probable cause when the Government shields the central allegations while simultaneously using them to justify force, arrest, and prosecution.

The misuse of Rule 6(e)(4), the false fugitive designation, the warrant executed 186 days after the stop, the continuing warrantless surveillance, and the deployment of a dangerous high-risk arrest in front of Defendant's children, collectively constitute structural violations of fourth, fifth, and sixth Amendments regarding confrontation, due process, and excessive force.

These constitutional violations directly intersect with the suppression issues before the Court. The Government's withholding of material information, concealment of operative allegations, and reliance on sealed and unchallengeable assertions materially distort the evidentiary

landscape, impede effective adversarial testing, and reinforce the necessity of suppression, expanded evidentiary hearings, full disclosure of all sealed materials, and remedial orders addressing the Government's conduct.

## IX. Discovery and Evidentiary Remedies; Subpoenas

The facts at issue turn on contemporaneous electronic records (CAD, 911 audio, radio logs), police internal communications about the October 1 meeting, and witness testimony from OVPD personnel and meeting attendees. Those materials are discoverable and material to the motion to suppress. Rule 17 authorizes subpoenas for witnesses and documents material to pretrial motions and to compel attendance at hearings; ex parte requests (and, if necessary, Rule 17(b) assistance for an indigent defendant) are appropriate where attendance is necessary for an adequate defense. See Appendix A, § VI.

Given the centrality of the October 1 meeting to the question whether the callers were acting at police direction, subpoenas should be issued for (a) OVPD personnel who organized or attended the meeting and (b) civilian attendees. Narrowly tailored duces tecum subpoenas should also seek meeting notes/emails/texts, any guidance given to attendees, related dispatch/CAD communications, and towing/inventory policy documents.

## X. Government Misrepresentations and Impeachment of Officer Brandstrom

The need for suppression and an expanded evidentiary hearing is heightened by the pattern of misrepresentations in the Government's submissions and in Officer Brandstrom's reporting, and by the resulting impeachment of Brandstrom's credibility.

First, the Government repeatedly described the 911 callers as "self-identified neighbors," suggesting the reliability associated with identified citizen-informants. The contemporaneous 911 recordings and Master Call Table entries, however, classify the callers as anonymous and include explicit assertions of anonymity by the callers themselves. Rebranding anonymous callers as "self-identified neighbors" materially inflates their indicia of reliability and invites the Court to apply the wrong legal standard to their reports. That is not a minor semantic slip; it structurally alters the Fourth Amendment analysis.

Second, the Government's "double ATL" narrative is flatly inconsistent with the CAD. The first call (V24100121) was coded as "Suspicious Activity" and closed "No Contact," with no ATL generated. Only the second call (V24100125) produced an ATL entry, and even that label resulted solely from the dispatcher's decision to type "driving on suspended license" into CAD without contemporaneous MVD confirmation. Elevating this sequence into "two ATL calls" is a post-hoc construction, not an accurate description of the record.

Third, the Government and Brandstrom have repeatedly described the October 3 event as a "custodial arrest" to justify both the tow and the inventory search. Yet the contemporaneous disposition in CAD classifies the incident as cite-and-release. That inconsistency goes directly

to whether there was any legitimate community-caretaking need to impound the vehicle and underscores that the tow was discretionary and investigative in nature.

Fourth, Brandstrom's credibility is further impeached by his handling of prior contacts with Defendant, including the April 17 encounter where he fabricated his reason for the stop, attempted to search Defendant's vehicle despite lacking a lawful basis, and where Defendant refused consent. The attempt to search and the refusal—highly relevant to understanding both motive and pattern—are omitted from his supplemental report. Again, precisely 180 days later, on October 17, he and the majority of officers present on October 3 pulled Defendant over in a manner suggesting coordinated surveillance rather than happenstance, again with no contemporaneous traffic infraction or mechanical defect. He was reported as the stopping officer; Officer Cantu embedded a reference to Brandstrom's supplemental for details, which was not included in the reports. He was also logged into a different call ID than the one reported while making database queries on Defendant. When an officer omits facts that reflect unfavorably on his conduct and support the defense, while his later narrative conflicts with objective CAD, radio, and classification entries, the Court is justified in viewing his characterization of October 3 with substantial skepticism.

Taken together, these misrepresentations and omissions demonstrate that the Government's narrative of the October 3 stop is advocacy, not neutral fact-reporting. The Court should not accept that narrative over the contemporaneous records. Instead, it should treat the pattern of misdescription as impeachment, require live testimony, and rely on the CAD, radio logs, Master Call Tables, and 911 recordings as the best evidence of what actually occurred.

15

*Requested Relief*

In addition to the relief requested herein, Defendant has filed a separately captioned **Supplemental Motion for Expanded Evidentiary Scope, Discovery, and Subpoenas**, which is incorporated by reference. That Supplemental Motion details the specific categories of CAD, radio, 911, internal-communication, surveillance, jurisdictional, and federal-coordination materials necessary for full adjudication of the suppression issues; identifies the OVPD and civilian witnesses whose testimony is material under Rule 17(a); and requests production of documents and communications under Rule 17(c) directly bearing on police direction of civilian actors, collective-knowledge assertions, the false fugitive designation, and the improper Rule 6(e)(4) seal. Defendant respectfully asks the Court to grant the relief set forth in both this Brief and the accompanying Supplemental Motion.

*CONCLUSION*

The contemporaneous record—911 recordings, CAD entries, radio logs, Master Call Table timestamps, and documented gaps—demonstrates that the October 3, 2024 stop lacked lawful reasonable suspicion from the outset. No officer possessed, and no officer contemporaneously transmitted, information capable of supplying reasonable suspicion; therefore, the collective-knowledge doctrine cannot be invoked. The subsequent tow and inventory search were discretionary, pretextual, and unsupported by any legitimate community-caretaking rationale, rendering all fruits of the search inadmissible.

These constitutional defects are compounded by OVPD's use of anonymous, police-directed civilian actors; the Government's mischaracterization of those callers; timestamp irregularities; gaps in the documentary record; and the prejudicial misuse of a false "fugitive" designation and improper sealing under Rule 6(e)(4). Taken together, the record reflects violations of the Fourth, Fifth, and Sixth Amendments that compromise the integrity of these proceedings. On it's face, this appears more as the federal prosecution providing unjustified sanctuary to the egregious and prejudicial actions of another sovereign.

For these reasons, Defendant respectfully requests suppression, expanded evidentiary review, and appropriate remedial orders, including discovery, subpoenas, and sanctions where warranted.

Respectfully submitted,

Executed on this 20 day of NOVEMBER, 2025.

_____

Cody Christian Likens

Defendant, Pro Se

10065 N. Alderspring Dr.

Oro Valley, AZ 85737

520-425-7415

codylikens1@gmail.com