**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-25-01354-001-TUC-AMM (MSA) |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Cody Christian Likens, | |
| Defendant. | |

Pending before the Court is Defendant Cody Christian Likens's motion to suppress. The Court will recommend that the motion be denied.

**Factual Findings**

This case arises from a vehicle stop on October 3, 2024. At around 7:00 p.m., a dispatcher for the Oro Valley Police Department (OVPD) broadcasted an "Attempt to Locate," stating that an anonymous person had called and reported that Defendant was driving while on a suspended license. (Tr. 6.) The dispatcher confirmed in the radio broadcast that Defendant's license was suspended. (Tr. 7, 50.) OVPD Officer Kristofer Brandstrom received this initial broadcast, as well as a similar (but unverified) broadcast about Defendant that went out at around 9:30 p.m. (Tr. 7–8; Pl.'s Ex. 2.)

Around 15 minutes after the second call, Officer Brandstrom saw Defendant driving a flatbed truck near the intersection of Oracle Road and Water Harvest Way.[1] (Tr. 11–13.) Officer Brandstrom ran a records check, though he does not recall whether it confirmed the

---

[1] Officer Brandstrom had encountered Defendant before and recognized him after pulling alongside Defendant's truck and observing him through the open window. (Tr. 13.)

1 suspension of Defendant's license. (Tr. 14.) He then activated his emergency lights and
2 initiated a traffic stop. (Tr. 14.) The stop began at 9:49 p.m. (Tr. 11–12; Pl.'s Ex. 7.)

3 Officer Brandstrom approached Defendant's truck and told Defendant that he had
4 been stopped because of a suspended license, and Defendant acknowledged that his license
5 was suspended. (Pl.'s Ex. 7.) At 9:59 p.m., Officer Brandstrom removed Defendant from
6 the truck and placed him under arrest. (Pl.'s Ex. 7.) A few minutes later, at 10:03 p.m.,
7 OVPD Officer Timothy Fletcher requested a tow truck, and another officer conducted a
8 canine sniff of the truck. (Tr. 19–20, 24; Def.'s Ex. 20.) Officers then conducted an
9 inventory search of the truck, discovering a firearm and silencer in a secured container.
10 (Tr. 20–21.) The tow truck arrived at 10:18 p.m. (Tr. 24.)

**Discussion**

12 Defendant argues that the traffic stop was not supported by reasonable suspicion.
13 He also argues that the inventory search was pretextual and thus invalid. The Court finds
14 that both the stop and search were constitutional.

15 **I.    The stop was supported by reasonable suspicion.**

16 A traffic stop must be supported by at least reasonable suspicion. *Kansas v Glover*,
17 589 U.S. 376, 380 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).
18 Reasonable suspicion exists when, based on the "totality of the circumstances," an officer
19 has "a particularized and objective basis for suspecting the particular person stopped of
20 criminal activity." *Cortez*, 449 U.S. at 417–18. This standard requires more than a "hunch"
21 that criminal activity is occurring but "considerably less than proof of wrongdoing by a
22 preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting
23 *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

24 Officer Brandstrom's testimony establishes reasonable suspicion for the traffic stop.
25 It is unlawful in Arizona for a person to drive a motor vehicle on a public highway while
26 his license is suspended. A.R.S. § 28-3473(A). Officer Brandstrom testified that, at around
27 7:00 p.m., a dispatcher broadcasted an "Attempt to Locate" relating to Defendant.
28 (Tr. 6–7.) He testified that the broadcast included an anonymous person's report that

1  Defendant was driving while on a suspended license *and also* the dispatcher's independent
2  confirmation that Defendant's license was suspended. (Tr. 7, 48.) He further testified that
3  the call notes on his computer showed that independent confirmation. (Tr. 50–51.)[2] Officer
4  Brandstrom could reasonably rely on the dispatcher's personal knowledge. *See United*
5  *States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) ("[T]he dispatcher's
6  knowledge is properly considered as part of our analysis of reasonable suspicion."). And
7  as less than three hours had passed when Officer Brandstrom encountered Defendant, that
8  information easily provided reasonable suspicion (and likely probable cause) to believe
9  that Defendant was driving on a suspended license.

10  Defendant's arguments to the contrary are not persuasive. He first argues that
11  Officer Brandstrom lacked reasonable suspicion because he relied on the dispatcher's
12  report, and the dispatcher's report was based on the anonymous caller's report. (Tr. 78.) It
13  is true that "[f]or a third-party report of suspected criminal activity to form the basis of an
14  officer's reasonable suspicion, that report must possess sufficient indicia of reliability."
15  *Fernandez-Castillo*, 324 F.3d at 1117. The dispatcher here, though, did not simply relay
16  the first caller's report; the dispatcher relayed the report *and* the dispatcher's independent
17  confirmation. As noted, Officer Brandstrom could reasonably rely on the latter.[3]

18  Defendant next argues that the Government and Officer Brandstrom have repeatedly
19  and falsely characterized "the two 911 callers as 'self-identified neighbors'" when in fact
20  they were anonymous. (Doc. 54 at 2.) Defendant asserts that this is "a deliberate attempt

---

[2] Officer Brandstrom testified that, when he runs a records check, the computer brings up a page with the subject's picture and driving record. (Tr. 49.) To see the subject's driving status, he has to double-click to get to another page. (Tr. 49.) Because he could not recall whether he double-clicked into the page for Defendant's driving status, the Court asked whether "the only person that had confirmed . . . that the license was suspended was the dispatcher who passed along the information to [him]." (Tr. 50.) Officer Brandstrom responded affirmatively, and the Court followed up by asking "how was it confirmed [by the dispatcher]." (Tr. 50.) He responded that the comments of the call screen showed confirmation that Defendant's license was suspended. (Tr. 50.) Thus, Officer Brandstrom testified about two paths to learning Defendant's driving status: a records check, which he could not recall completing; and the radio broadcast, which he recalled receiving and which was verified on the call screen. The Court clarifies this only because the Government's supplemental brief, which was prepared without the benefit of the transcript, does not accurately reflect Officer Brandstrom's testimony. (*See* Doc. 44 at 2.)

[3] The dispatcher relayed the second call without independently confirming it. (*See* Pl.'s Ex. 2.) So, that call did not add to Officer Brandstrom's reasonable suspicion.

to assign unwarranted indicia of credibility to the callers, recasting what were in fact anonymous, police-directed informants as if they were concerned identified citizen witnesses." (*Id.*) Officer Brandstrom, however, did not testify that the callers identified themselves as Defendant's neighbors; he agreed that the callers were anonymous. (Tr. 37.) While the Government's response to the motion to dismiss does state that the callers "self-identified as neighbors of Cody Likens," that response was a mere proffer of information. (Doc. 29 at 1.) Discrepancies between proffers and later testimony are not uncommon and thus do not show bad faith. The testimony is what governs and is what the Court relied on here. It is also what the Government relied on in its supplemental brief. (*See* Doc. 44 at 5 (describing the callers as "anonymous").)

Defendant next argues that the Government is "seeking to convert a civilian dispatcher's unverified assumption [that his license was suspended] into the linchpin of reasonable suspicion and to resuscitate that assumption through a misapplied collective-knowledge doctrine." (Doc. 54 at 3.) However, as discussed above, the testimony is that the dispatcher confirmed the caller's report. Defendant also argues that Officer Brandstrom is not credible because, contrary to his testimony that there were two "Attempts to Locate," OVPD records show that there was only one "Attempt to Locate" logged in relation to the second call at 9:30 p.m. (*Id.* at 3–4.) The first call at 7:00 p.m., he says, was logged as "Suspicious Activity" and closed as "No Contact" after officers could not locate him. (*Id.*) Even if that is true, it does not affect the Court's conclusion. There is no dispute that there were two radio broadcasts. Officer Brandstrom testified about the content of the first broadcast, and the Court finds his testimony credible. In this Court's view, a discrepancy as to how the call was administratively logged is not the type of conflict or contradiction that warrants rejection of his testimony.

Finally, Defendant argues that there are timestamp irregularities and gaps in the call log that "materially impair the Government's ability to reconstruct a lawful basis for its actions." (Doc. 54 at 9.) The key facts, however, are undisputed. There were two calls, and the first provided reasonable suspicion for the stop. The purported discrepancies do not

1  change those facts and thus do not affect the Court's conclusion.

2  **II.     The inventory search was valid.**

3  Inventory searches are "a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). An inventory search is valid only if it is conducted "in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) (citing *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)). "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). That said, "the mere presence of a criminal investigatory motive or a dual motive—one valid, and one impermissible—does not render an [inventory] search invalid." *Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) (alteration in original) (quoting *United States v. Johnson*, 889 F.3d 1120, 1126 (9th Cir. 2018) (per curiam)). "When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation." *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993).

The inventory search here was valid. To begin, the officers had a proper community caretaking purpose in towing the truck: they were removing a traffic hazard. "Whether an impoundment is warranted under the community caretaking doctrine depends on the location of the vehicle and the police officers'[] duty to prevent it from creating a hazard to other drivers or from being a target for vandalism or theft." *United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008). Defendant was pulled over on the northbound side of Oracle Road, just north of Water Harvest Way. (Tr. 42.) Officer Brandstrom testified, and his bodycam video shows, that the truck was parked on an uphill slope in a dark area that lacked streetlights. (Tr. 19; Pl.'s Ex. 7.) Officer Brandstrom testified that these conditions made the truck a traffic hazard. (Tr. 19, 42.) The Court finds that his belief was reasonable.

Defendant points out that, in the past, officers had let him go and had let his brother

retrieve his vehicle. (Tr. 32, 69.) He points out that the October 3 stop occurred near his home, such that his brother could have been at the scene within minutes, and that he was talking to his mother during the stop. (Tr. 68–69; Pl.'s Ex. 7.) The officers no doubt could have addressed the traffic hazard in a way that was more favorable to Defendant. But Defendant offers no authority for the proposition that an officer must exercise his discretion in the least intrusive way possible, nor has the Court found any. Persuasive authority holds otherwise. *See United States v. Vick*, 145 F.4th 191, 198 (1st Cir. 2025) (stating that "officers are not constitutionally required to select the least intrusive—or most optimal— way of fulfilling their community caretaking responsibilities" (internal quotation marks and brackets omitted) (citation omitted)).

Next, the officers complied with OVPD policy. First, OVPD policy provides that a vehicle must be towed "[w]henever a person in charge or in control of a vehicle is arrested" (subject to one exception) or "when the community caretaker doctrine would reasonably suggest that the vehicle should be towed." (Pl.'s Ex. 4 at 4.) As stated above, the officers had a proper community caretaking purpose. In addition, towing was required because the officers had arrested Defendant, and parking the truck in a safe location (the one exception) was not a reasonable option. (Tr. 42 (Q: "So, you could have parked that vehicle in the Oro Valley Marketplace, could you have not?" A: "We were up the hill from Oro Valley Marketplace. That would have required us to drive Mr. Likens's vehicle and make a U-turn at Tangerine and Oracle and then back down and park it for him. That's not something we typically would do.").)

Second, the OVPD search policy applies only to "stored or impounded vehicle[s]." (Pl.'s Ex. 4 at 4.) "The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment," and "[a] seizure results if 'there is some meaningful interference with an individual's possessory interests in that property.'" *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)). Defendant's truck was impounded once he was arrested and officers decided to tow it. This undoubtedly was a "meaningful interference" with his possessory interest in the truck. *See*

1  *Impound*, Black's Law Dictionary (12th ed. 2024) ("To place (something, such as a car or other personal property) in the custody of the police or the court."). Furthermore, Officer Fletcher, who participated in the search of Defendant's truck, testified that officers routinely conducted inventory searches on the roadside before towing. (Tr. 55.) As such, Defendant's truck was subject to search.

Finally, as to the scope of the search, OVPD policy requires that officers inventory "[a]ll property," including property in "the trunk and [in] any compartments or containers, even if they are closed and/or locked." (Pl.'s Ex. 4 at 4.) It further requires that officers "be as thorough and accurate as practicable in preparing an itemized inventory," as the inventory policy is designed to "protect[] an owner's property while the owner is in police custody, to provide for the safety of officers and the public, and to protect the Department against fraudulent claims of lost, stolen or damaged property." (*Id.*) This is a proper policy, as it is designed to produce an inventory and sufficiently limits officer discretion. *See Wells*, 495 U.S. at 4 (stating that the policy "should be designed to produce an inventory" and should not afford officers "uncanalized discretion"). The officers complied with the policy here. The bodycam video shows that they searched the truck cabin and truck bed, including any containers. (Pl.'s Ex. 7; Def.'s Ex. 20.) And the record contains an inventory sheet with a list of around 50 items of personal property. (Pl.'s Ex. 5.) As such, the Court finds that the officers carried out the inventory search in compliance with OVPD policy.

Defendant's truck was towed in furtherance of a community caretaking purpose, and the officers conducted the inventory search in conformance with OVPD's standardized procedures. Therefore, the Court finds that the inventory search was lawful.

Defendant's challenges to the search are not persuasive. He first argues that the officers violated OVPD policy by conducting a roadside search, because the policy does not expressly authorize such searches. (Tr. 79.) But the policy does not prohibit them either. Nor does it specifically authorize searches at any other location, such that the Court could infer that unmentioned locations are excluded. In short, the policy authorizes inventory searches without regard to a vehicle's location, so the roadside search was not a violation.

Defendant's primary argument is that the search was pretextual. He raises numerous points to support this argument: in April 2025, Officer Brandstrom released Defendant after stopping him for driving on a suspended license (Tr. 32, 78); two days before the stop at issue here, OVPD officers met with Defendant's neighbors to talk about "catch[ing]" Defendant (Tr. 29, 63; Doc. 54 at 8); the call for the tow occurred three minutes after Defendant's arrest (Tr. 59, 78); the police conducted a canine sniff of the truck (Tr. 41, 78); the stop occurred close to Defendant's home, such that his brother or mother could have retrieved the truck in lieu of towing (Tr. 69, 80); the call was logged as a cite-and-release rather than a custodial arrest (Doc. 54 at 9); the stop was prolonged beyond the time needed to address the reason for the stop (*id.* at 10); and Officer Brandstrom and others conducted a high-risk stop on Defendant two weeks after the stop at issue here (*id.* at 12, 15).

An extended analysis of the pretext issue is unnecessary. Pretextual traffic stops are constitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996). Pretextual inventory searches are also constitutional, so long as they advance a bona fide community caretaking purpose. *Snitko*, 90 F.4th at 1261 ("[A]t least in this circuit, 'dual motives' are permissible in the inventory search context"); *see Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (stating that the police must not act "in bad faith or *for the sole purpose* of investigation" (emphasis added)). The Court has seen and heard enough to believe that OVPD was targeting Defendant, and that the officers desired to search his truck for contraband. (*See* Pl.'s Ex. 7 (showing Officer Brandstrom asking whether the truck contained contraband); Def.'s Ex. 20 (showing the canine sniff).) But as explained above, Officer Brandstrom's testimony establishes that officers had a valid community caretaking purpose in towing the truck. His testimony is credible and not disputed, nor is it undermined by the administrative irregularities proffered by Defendant. (Doc. 54 at 14–15.) This second, permissible motive means that the inventory search was valid notwithstanding any investigatory motive.

## Conclusion

The stop was supported by reasonable suspicion, and the inventory search was valid. Therefore, the Court recommends that the motion to suppress (Doc. 26) be **denied**.

1   This recommendation is not immediately appealable to the United States Court of
2   Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections
3   with the district court. Fed. R. Crim. P. 59(b)(2). The parties have 14 days to respond to
4   objections. The parties may not file replies on objections absent the district court's
5   permission. A failure to file timely objections may result in the waiver of de novo review.
6   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 19th day of December, 2025.

_____
Honorable Maria S. Aguilera
United States Magistrate Judge

- 9 -